## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JESUS RODRIGUEZ, | : |
|     Petitioner, | : Civ. No. 16-1315 (KM) |
| v. | : |
| STEVEN JOHNSON and THE ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, | : **OPINION** |
|     Respondents. | : |

### KEVIN MCNULTY, U.S.D.J.

### I.    INTRODUCTION

Before this Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by petitioner Jesus Rodriguez ("Mr. Rodriguez" or "Petitioner"). (DE 1.) Mr. Rodriguez is presently confined at New Jersey State Prison in Trenton, New Jersey. For the reasons set forth below, Mr. Rodriguez's habeas petition and renewed motion for an evidentiary hearing are denied, and a certificate of appealability will not issue.

### II.    BACKGROUND

#### A.  Factual Background

This Court, affording the state courts' factual determinations the appropriate deference, *see* 28 U.S.C. § 2254(e)(1),[1] will reproduce the pertinent relevant facts set forth by the Appellate Division of the Superior Court of New Jersey ("Appellate Division") in (1) its April 12, 2004

---

[1]    Pursuant to 28 U.S.C. § 2254(e)(1), "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

written opinion during direct appeal (*State v. Romero*, Nos. A–4974–99, A–6593–99, A–0282–00, A–0834–00, A–5704–00 (App. Div. Apr. 12, 2004) (slip op. at 1–118) (DE 10-2; DE 10-3)); and (2) its August 26, 2015 written opinion affirming denial of post-conviction relief ("PCR") (*State v. Rodriguez*, No. A-3656-12T1, 2015 WL 5038103, at *1 (N.J. Super. Ct. App. Div. Aug. 26, 2015).)

Mr. Rodriguez and nine co-defendants were members of a local New Jersey chapter of a national organization called the Latin Kings. The Orange Crush was an elite enforcement group of the Latin Kings, appointed by defendant Luis Manso, a Latin Kings regional officer. Orange Crush handled special problems of Latin Kings members. *Rodriguez*, 2015 WL 5038103, at *1. (DE 10-2 at 9.)

According to defendant David Martinez, defendant Michael Romero held a Latin Kings member meeting at his Jersey City home on June 29, 1998. He explained that, the day before, Omar D. Morante ("Omar D") and Jimmy Cabrera had conducted a drive-by shooting at his apartment complex. Mr. Romero believed that he had been the shooting's intended target. He wanted the Latin Kings to retaliate on his behalf. Defendant Charles Byrd, who attended the meeting, agreed. He ordered Orange Crush to kidnap Omar D and Jimmy Cabrera that night, break their shooting arms, and then kill them. *Rodriguez*, 2015 WL 5038103, at *1.

Later that day, roughly twenty-five Latin Kings members met at Romero's home. *Id.* at *2. After that meeting, David Martinez drove Edwin Rivera's Bronco, with Edwin Rivera, Miguel Torres, Juan Cortes, and Omar W. Morante ("Omar W") as passengers. Luis Manso drove his car, with Michael Romero, Jose Antonio Perez, and Omar D (Omar W's twin brother)) as passengers. Juan DeJesus drove Jesus Rodriguez's vehicle, with Jesus Rodriguez, Luis

Rodriguez, Edwin Diaz, Jimmy Cabrera, and Sfand Rajabzaden as passengers. *Id*. (DE 10-2 at 8-9.)

Because David Martinez was not sure of their destination in Newark, he pulled over near an interchange on the New Jersey Turnpike. The other cars followed. Luis Manso used the pay phones at the interchange to call Charles Byrd and confirm that their orders were to carry out the punishment without a "trial." According to David Martinez, while Luis Manso was speaking to Charles Byrd, Jesus Rodriguez asked to speak to Charles Byrd to persuade him that a "trial" was necessary, but Luis Manso told him that Charles Byrd refused to reconsider the issue. According to Juan DeJesus, when Luis Manso hung up the phone, he said: "[Byrd] said we got to do this." *Rodriguez*, 2015 WL 5038103, at *1.

While they were stopped at the Turnpike rest area, Omar W -- fearing the others' intended plan -- sought the help of a toll collector, under the guise of using the restroom. The collector directed him to a nearby toll office. Recognizing what was transpiring. Luis Martinez tried to interrupt by grabbing Omar W's arm. When the toll collector objected. Martinez released Omar W, and the cars pulled away. Intended victims Omar W and Juan Cortes escaped from the cars. (DE 10-2 at 9.)

Intended victims Omar D and Jimmy Cabrera. however, were taken to Branch Brook Park in Newark, where they were strangled to death and left lying face down in the water. (DE 10-2 at 9.)

Two eyewitnesses to the murders. Ricardo Diaz and Luis Rodriguez, testified for the State. Although their versions of the circumstances surrounding the murders differed to some extent, each testified that Jesus Rodriguez and Michael Romero directly participated in the

3

killings. *Rodriguez*, 2015 WL 5038103, at *2. The two witnesses also testified that Luis Manso was at the scene and said "Set it off," after which the attack began. *Id.*

According to Ricardo Diaz, Jesus Rodriguez grabbed Omar D in a headlock in the park, then handed him over to Juan Antonio Perez. (DE 10-2 at 16.) Michael Romero grabbed Jimmy Cabrera, who was not fighting back much. (*Id.*) However, Omar D was resisting so strongly that Michael Romero had to help Juan Antonio Perez, who held down Omar D while Michael Romero beat him with a belt. (*Id.*) Romero also kicked and punched Cabrera, tore off his shirt, twisted it around his neck, and instructed Diaz to hold it tightly -- which he did until Cabrera stopped moving. *Id.* Ricardo Diaz further testified that Luis Manso directed him to drag Cabrera's body to the water, which he did. *Rodriguez*, 2015 WL 5038103, at *2.

According to State witness Luis Rodriguez, Luis Manso ordered him to help Juan Antonio Perez drown Omar D, but Luis Rodriguez refused. *Rodriguez*, 2015 WL 5038103, at *1. Omar D was still struggling, so they dragged him towards the water as he screamed: "I'll tell you whatever you want, just don't kill me. Leave me alone please." Michael Romero and Juan Antonio Perez appeared to be trying to drown Omar D, and when he stopped moving, Perez dragged the body further into the water. At Luis Manso's direction, Ricardo Diaz dragged Jimmy Cabrera's body to the water, as well. (DE 10-2 at 16.)

Ricardo Diaz left the crime scene in Jesus Rodriguez's car with Jesus Rodriguez, Luis Rodriguez, and Juan DeJesus. (*Id.*) Luis Rodriguez asked Diaz "if that was his first, and he was speechless." (*Id.*) Luis Rodriguez said, "That kid put up a fight," and Jesus Rodriguez said, "Yeah, [he] was strong." (*Id.* at 16-17.)

Juan DeJesus also testified for the State. He explained that he stayed in the car at the scene of the attack because Jesus Rodriguez had told him to do so. Juan DeJesus did not witness

the murders. He testified, however, that he saw the others run sweaty and dirty from the bushes. *Rodriguez*, 2015 WL 5038103, at \*2.

### B. Procedural History

In November 1998, Mr. Rodriguez and his nine co-defendants were indicted and charged in eighteen counts with six different crimes against four victims, two of whom were killed. They were all charged with four counts of second-degree conspiracy to commit kidnapping; four counts of first-degree kidnapping; four counts of second-degree conspiracy to commit murder; two counts of murder; two counts of felony murder; and two counts of attempted murder. Edwin Diaz, who was also charged with additional counts, Ricardo Diaz, David Martinez, Sfand Rajabzaden, Edwin Rivera, and Miguel Torres pled guilty. The trial judge denied motions for separate trials. *Id.* at \*1.

Mr. Rodriguez and co-defendants Luis Manso, Michael Romero, Jose Antonio Perez, and Charles Byrd were tried jointly between January 24 and March 17, 2000. *Id.* Mr. Rodriguez was sentenced on April 26, 2000 and received two consecutive life sentences for the murder convictions, eighty-five percent without parole; four concurrent life sentences for the kidnapping convictions, eighty-five percent without parole; and concurrent fifty-year sentences for the attempted murder convictions. The remaining convictions merged. (DE 10-2 at 7.) Mr. Rodriguez and the co-defendants who were tried with him appealed. In an unpublished opinion, the Appellate Division affirmed the convictions. *State v. Romero*, Nos. A–4974–99, A–6593–99, A–0282–00, A–0834–00, A–5704–00 (App. Div. Apr. 12, 2004) (slip op. at 1–118) (DE 10-2; DE 10-3.) The Supreme Court denied certification. *State v. Romero*, 181 N.J. 548 (2004).

Mr. Rodriguez filed his PCR petition in March 2005. He raised issues primarily related to allegations of constitutionally ineffective assistance of trial[2], appellate, and PCR counsel, as well as trial errors not raised on direct appeal. *See Rodriguez*, 2015 WL 5038103, at *2.

The PCR judge held an evidentiary hearing on Mr. Rodriguez's PCR petition, as well as those filed by Mr. Manso, Mr. Romero, and Mr. Perez. *Rodriguez*, 2015 WL 5038103, at *3. In a written decision and order dated January 7, 2013, the PCR judge denied relief and dismissed Mr. Rodriguez's petition. (DE 10-6.) He reached the same result with respect to the petitions filed by the other three defendants. (*Id.*) *Rodriguez*, 2015 WL 5038103, at *3.

Mr. Rodriguez appealed the denial of PCR, raising seven issues, including his trial attorney's IAC for "fail[ure] to attend or procure replacement counsel for all jury selection proceedings." (DE 10-5 at 3.) In his pro se supplemental brief, Mr. Rodriguez argued that trial counsel rendered IAC by "fail[ing] to advise [Petitioner] on whether or not to testify, to inform him that the choice whether to testify was ultimately his to make, and to honor [Petitioner's] wish to testify." (DE 10-6 at 3.) In a second pro se supplemental brief, Mr. Rodriguez again argued IAC by trial counsel's failure to inform him of his right to testify, which prejudiced him. (DE 10-7 at 5.) *Rodriguez*, 2015 WL 5038103, at *3.

In a detailed written opinion filed on August 26, 2015, the Appellate Division affirmed denial of PCR. *Rodriguez*, 2015 WL 5038103, at *5-10.

On March 3, 2016, Mr. Rodriguez filed his § 2254 Petition with this Court. (DE 1 at 17.) He raises four grounds for relief: (1) ineffective assistance of counsel ("IAC") by his trial

---

[2]     With respect to claims of ineffective assistance of counsel ("IAC") by his trial counsel, Paul Feinberg, Esquire, Mr. Rodriguez argued that Feinberg: failed to request severance of Mr. Rodriguez's case from those of his co-defendants; failed to object to the State's systematic elimination of Hispanics from the jury; failed to be present at all times during jury selection; failed to adequately investigate the case; failed to request a hearing on Mr. Rodriguez's minor status; and made "serious omissions and derelictions of duty." (DE 10-6 at 77-78.)

6

attorney in failing to advise Mr. Rodriguez of his right to testify at trial (DE 1 at 23); (2) IAC by trial counsel in failing to be present for three days during jury selection (*id.* at 25); (3) violation of Mr. Rodriguez's due process rights when "a juror who had been intimidated by outsiders was allowed to remain on the jury" (*id.* at 26); and (4) unconstitutional exclusion of Hispanics from the venire or the jury as seated. (*Id.* at 27.)

On May 2, 2016, Respondents filed an answer (DE 10), to which Mr. Rodriguez filed a reply. (DE 24.)

## III.   LEGAL STANDARDS

Under 28 U.S.C. § 2254(a), the district court "shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." A habeas petitioner has the burden of establishing his entitlement to relief for each claim presented in his petition based upon the record that was before the state court. *See Eley v. Erickson,* 712 F.3d 837, 846 (3d Cir. 2013); *see also Parker v. Matthews,* 567 U.S. 37, 40-41 (2012). District courts are required to give great deference to the determinations of the state trial and appellate courts. *See Renico v. Lett,* 559 U.S. 766, 773 (2010).

In general, a federal court may not grant a writ of habeas corpus under § 2254 unless the petitioner has "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To do so, a petitioner must "'fairly present' all federal claims to the highest state court before bringing them in federal court." *Leyva v. Williams,* 504 F.3d 357, 365 (3d Cir. 2007) (citing *Stevens v. Delaware Corr. Ctr.,* 295 F.3d 361, 369 (3d Cir. 2002)). This requirement ensures that state courts "have 'an initial opportunity to pass upon and correct alleged violations of prisoners' federal rights.'" *Id.* (citing *United States v. Bendolph,* 409 F.3d 155, 173 (3d Cir.

2005) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)). Even if a petitioner's constitutional claims are unexhausted, however, a habeas court has the discretion to deny them on the merits under 28 U.S.C. § 2254(b)(2). *See Taylor v. Horn*, 504 F.3d 416, 427 (3d Cir. 2007); *Bronshtein v. Horn*, 404 F.3d 700, 728 (3d Cir. 2005).

Where a claim has been adjudicated on the merits by the state courts, the district court shall not grant an application for a writ of habeas corpus unless that state court adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2). Federal law is clearly established for these purposes where it is clearly expressed in "only the holdings, as opposed to the dicta" of the opinions of the United States Supreme Court. *See Woods v. Donald*, 135 S. Ct. 1372, 1376 (2015). "When reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." *Id.* Where a petitioner challenges an allegedly erroneous factual determination of the state courts, "a determination of a factual issue made by a State court shall be presumed to be correct [and the] applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

For any particular issue, the relevant state court decision for purposes of federal habeas review is the last reasoned state court decision. *See Bond v. Beard*, 539 F.3d 256, 289-90 (3d Cir. 2008). These deferential standards apply, however, "even where there has been a summary denial" by the state court. *Cullen v. Pinholster*, 563 U.S. 170, 187 (2011). "In these

circumstances, [petitioner] can satisfy the 'unreasonable application' prong of § 2254(d)(1) only by showing that 'there was no reasonable basis' for the [state court's] decision." *Id.* at 187-88 (quoting *Harrington v. Richter*, 562 U.S. 86, 98 (2011)). Furthermore, "when the relevant state-court decision on the merits ...does not come accompanied with ... reasons ... [w]e hold that the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Because many of the claims sound in IAC, I review the governing standards briefly. In *Strickland v. Washington*, 466 U.S. 688 (1984), the U.S. Supreme Court held that a claim of ineffective assistance of counsel claim has two essential elements.

First, the petitioner must show that counsel's performance fell below an objective standard of reasonableness. *See* 466 U.S. at 688; *see also Ross v. Varano*, 712 F.3d 784, 798 (3d Cir. 2013). To do so, the petitioner must identify particular acts or omissions that were not the result of reasonable professional judgment. *See Strickland*, 466 U.S. at 690. The federal court must determine whether, in light of all of the circumstances, the identified acts or omissions fell outside the wide range of professional competent assistance. *See id.*

Second, the petitioner must affirmatively demonstrate prejudice. "Prejudice" means that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See id.* at 694; *see also McBride v. Superintendent, SCI Houtzdale*, 687 F.3d 92, 102 n. 11 (3d Cir. 2012). "With respect to the sequence of the two prongs, the *Strickland* Court held that 'a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies ... If it is easier to dispose of an ineffectiveness claim on the ground of

9

lack of sufficient prejudice, which we expect will often be so, that course should be followed.'"

*Rainey v. Varner*, 603 F.3d 189, 201 (3d Cir. 2010) (quoting *Strickland*, 466 U.S. at 697).

Finally, on habeas review, it is not enough that a federal judge would have found counsel ineffective. The judge must find that the state court's resolution of the IAC issue itself was unreasonable, a higher standard:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 562 U.S. at 101 (internal quotation marks and citation omitted; emphasis in original).

## IV.   DISCUSSION

### A. Ground One: Ineffective Assistance of Counsel By Failing To Advise Petitioner Of His Right To Testify At Trial

Mr. Rodriguez alleges that his trial counsel, Mr. Feinberg, rendered IAC by "not advis[ing] Petitioner of his right to testify, nor that the choice whether to testify was ultimately his to make." (DE 1 at 23 ("IAC-Testify Claim").) In light of the record before me and governing federal law, for the reasons stated below, I find that (1) the state court rejection of the IAC-Testify Claim was neither contrary to nor an unreasonable application of *Strickland*; and (2) that Mr. Rodriguez has made no showing of prejudice, *i.e.*, a specific proffer of genuinely exculpatory testimony that would have enhanced his chances of acquittal.

**(1) State court ruling on IAC-Testify claim**

The last reasoned decision on Mr. Rodriguez's IAC-Testify Claim was that of the Appellate Division on appeal from the denial of PCR. *See Rodriguez*, 2015 WL 5038103, at *1. The Appellate Division "reach[ed] the merits" of, and rejected, the IAC-Testify Claim on Mr. Rodriguez's appeal from the denial of PCR. *Rodriguez*, 2015 WL 5038103, at *8.

The Appellate Division's decision correctly set forth the governing law, including (1) a criminal defendant's constitutional right to testify and (2) defense counsel's responsibility to advise his client on whether or not to testify, with explanation of "the tactical advantages and disadvantages of doing so or of not doing so." *Rodriguez*, 2015 WL 5038103, at *8 (internal citations omitted).

Next, the Appellate Division considered pertinent parts of the record, summarizing them as follows:

> [Mr.] Feinberg testified at the hearing that he "always talk[ed] to the defendant about the right to testify," and that his "standard practice [was] to continue talking during the course of the case to see whether they want to testify." He added that, at the end of the State's case, he "typically [sat] down with the client and go over that." However, he had no independent recollection of doing so with [Mr.] Rodriguez. He acknowledged that, although he "routinely" asked the trial judge to voir dire his client on the issue, he had not done so in this case.

*Id.* at *9. The Appellate Division reasoned that "the PCR judge could have found that Mr. Feinberg followed his usual practice and advised Mr. Rodriguez of his right to testify, especially in light of Mr. Rodriguez's failure to certify to the contrary." *Id.* Alternatively, however, the Appellate Division determined that the IAC-Testify Claim failed for lack of prejudice: "[E]ven if we were to find that Rodriguez was not advised of his right to testify, we conclude that Rodriguez has not satisfied the second *Strickland* prong on this issue." *Id.*

On the *Strickland* prejudice prong, the state courts considered Mr. Rodriguez's claims that (1) he would have testified at trial that his part in the crimes was minimal and due to duress, (2) he played no part in the pre-murder meeting, (3) he thought the murder victims were being taken to the park for only a light assault, and (4) he tried unsuccessfully to stop the murders. The Appellate Division observed, however, that "[t]hose assertions have never been supported by any certification." *Id.* Furthermore, if Mr. Rodriguez had testified, his prior criminal record and his admission that he had some involvement with the Latin Kings and participated to some degree in the events of June 29, 1998, would have "opened him up to considerable cross-examination and would most likely have been counterproductive." *Id.* For these reasons, the Appellate Division found "no basis to conclude that there was 'a reasonable probability' that 'the result of the [trial] would have been different' had Rodriguez testified as he claims he would have." *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984). On August 26, 2015, the Appellate Division affirmed denial of PCR. *Rodriguez*, 2015 WL 5038103, at *10. On December 16, 2015, the New Jersey Supreme Court denied certification. *See State v. Rodriguez*, 127 A.3d 704 (N.J. 2015).

**(2) State Court Rejection Of The IAC-Testify Claim Was Not Unreasonable**

The state court correctly articulated the *Strickland* standard and reasonably applied it to the facts of Mr. Rodriguez's case. This is not a silent record. During the PCR evidentiary hearing, Rodriguez was represented by counsel, Michael G. Paul, Esq. ("PCR counsel"). PCR counsel called Mr. Rodriguez's trial counsel, Mr. Feinberg, as a witness. (DE 17-1 at 91). Mr. Paul asked trial counsel whether he recalled discussing with Mr. Rodriguez his right to testify at trial. (DE 17-1 at 94-95.) Trial counsel replied that although he had "no independent recollection of that," it was his "standard practice to do it." (*Id.* at 95 ("I can't say that I have any memory in doing it in this particular case. We're talking about 11 years ago, approximately 12 years ago").)

12

On cross-examination, he elaborated further:

> Paul Feinberg, Esquire: Well I, in preparation of the case, I always talk to the defendant about the right to testify. My standard practice is to continue talking during the course of the case to see whether they want to testify. Then at the end of the State's case when it's time to put our case on, I typically sit down with the client to go over that. Now do I have a recollection of doing that in this case? I have no independent recollection of it.

> Assistant Prosecutor: Is it fair to say it was your habit and practice as a lawyer practicing for many years in capital cases and other murder cases to conduct yourself in that manner?

> Mr. Feinberg: Yes, and I believe it should be the practice of every lawyer who handles criminal cases.

(DE 17-1 at 104-05.) Mr. Rodriguez did not testify at the hearing.[3]

The only evidence of record, then, that was before the Appellate Division at the time it rejected the IAC-Testify Claim, was that Trial counsel believed he had informed Mr. Rodriguez of his right to testify at trial in accord with his invariable practice. The state court was entitled to credit counsel's on-the-record representations. The state court's finding that the deficient-performance prong was not satisfied by those facts was a reasonable application of *Strickland*.

### (3) Lack of prejudice

Mr. Rodriguez also has failed to demonstrate prejudice from the alleged error. That is, he does not specifically point to facts suggesting that he would have offered exculpatory testimony that had a reasonable probability of altering the result.

---

[3]     Mr. Rodriguez, who was represented both at trial and in the PCR proceedings, did not testify to the contrary, nor did he provide to the state courts any evidence that contradicted his Trial counsel's sworn testimony. Factually, his claim that counsel failed to advise him rested solely on unsupported contentions in his supplemental appellate pro se briefs in connection with PCR. (DE 10-6 at 13-14; DE 10-7 at 15-16.) The first time that Mr. Rodriguez ever made these contentions in sworn form was in this habeas matter, in his February 15, 2017 Declaration In Support Of His Motion For An Evidentiary Hearing ("Declaration"). (DE 27-2 at 1 ("Trial counsel failed to advise me about my right to testify").) Neither that Declaration nor anything equivalent was before the state courts. The presumption that this Court, on habeas review, must defer to reasonable state court fact finding is not overcome.

Of course, every defendant has a right to testify, and an equal and opposite right not to testify. He cannot do one without waiving the other. *See generally United States v. Pennycooke*, 65 F.3d 9, 11 (3d Cir. 1995). In any case, therefore, a convicted defendant who has opted for one alternative may base a claim on having foregone the other. It is perhaps for this reason that in such cases, the courts have required a somewhat specific statement of how the defendant's testimony might have changed the result.

Thus, for example, in *Palmer v. Hendricks*, 592 F.3d 386 (3d Cir. 2010), the Court of Appeals considered a similar claim of IAC, but found no prejudice. That petitioner stated that he had wished to assert a theory of self-defense, one which would have relied on his testifying to his version of the events. Still, said the court, Palmer had revealed nothing specific "about the facts to which Palmer would have testified." *Id.* at 395 (the petition "contain[ed] no factual matter regarding *Strickland*'s prejudice prong"). It was not enough, said the Court of Appeals, that the petitioner claimed to have acted in self-defense and wanted to "tell his side of the story." *Id.* Without further specificity, the petitioner had not met his burden to demonstrate an enhanced likelihood of acquittal, in the sense that the testimony would have been "genuinely exculpatory." *Id.* at 395–96. It upheld the denial of the habeas petition without a hearing.[4]

Mr. Rodriguez's IAC-Testify Claim suffers the same shortcomings. He expresses very little beyond a generalized desire to tell his side of the story. He is not specific about what his testimony would have consisted of, but posits that it would have "refuted" the State's case:

> I wanted to testify and put forth a defense contradicting the testimony of witnesses from the State who already had credibility problems and multiple

---

[4]     In contrast with this case, the petitioner in *Palmer* had been denied a hearing in state court as well, so AEDPA deference did not apply. 592 F.3d at 390, 399–400. On the other hand, however, *Palmer* rejected the petitioner's argument that even in the absence of a factual showing of prejudice, counsel's failure to advise of the right to testimony was a "structural" error that would mandate automatic reversal. *Id.* at 396–97.

14

criminal convictions, and whose questionable testimony was the only evidence against Petitioner. Petitioner's testimony would have been corroborated by Edwin Diaz, another codefendant who was cooperating with the state and plead guilty prior to trial. And also by the testimony of Juan DeJesus, a state witness. It cannot be emphasized enough that Petitioner's testimony was crucial for his defense because it refutes all evidence presented against him by the State.

(DE 1 at 23-24.) Mr. Rodriguez does not specify what he would have said, or how his say-so would have "refuted" the State's case.

At any rate, there is good reason to endorse the state court's skepticism that Mr. Rodriguez's testimony would have carried the day:

Rodriguez had a [criminal] record[5] and would have been cross-examined on that basis. His admission that he had some involvement with the Latin Kings and the events of June 29, 1998 would have opened him up to considerable cross-examination and would most likely have been counterproductive.

*Rodriguez*, 2015 WL 5038103, at *9. For these reasons, too, there was "no basis to conclude there was a 'reasonable probability' that 'the result of the [trial] would have been different' had Rodriguez testified as he claims he would have." *Id.*

It is well-settled that a petitioner has the burden of proving specific facts to support an allegation of ineffective assistance of counsel. *Sistrunk v. Vaughn*, 96 F.3d 666, 671 (3d Cir. 1996); *Wells v. Petsock*, 941 F.2d 253, 259–260 (3d Cir. 1991). The Appellate Division did not unreasonably apply the governing constitutional standards or unreasonably find the facts when it found, based on the record before it, that Mr. Rodriguez had not satisfied *Strickland*'s prejudice prong. *Rodriguez*, 2015 WL 5038103, at *9.

On both deficient-performance and prejudice grounds, then, Ground One of the Petition (IAC-Testify Claim) is denied.

---

[5]     Mr. Rodriguez's prior convictions do not seem to be listed in the documents that are before me. His criminal record was sufficiently serious, however, that it preponderated over mitigating factors in Mr. Rodriguez's sentencing. (DE 17-5 at 3.)

## B. Ground Two: Ineffective Assistance of Counsel – Absence for Three Days During Jury Selection

Mr. Rodriguez alleges that his trial counsel, Mr. Feinberg, rendered IAC by "fail[ing] to attend sessions of jury selection for three days due to his hospitalization following a heart attack. Trial counsel failed to arrange substitute counsel for [P]etitioner." (DE 1 at 25 ("IAC-Jury Selection Claim").) According to Mr. Rodriguez, trial counsel's absence also impaired his objections to under-representation of Hispanics on the jury (*id.*), a claim that is discussed substantively at Section IV.C, *infra*.

The trial record confirms that Mr. Feinberg was indeed absent for three days at the outset of the jury selection process: January 24, 26, and 27, 2000. *See Rodriguez*, 2015 WL 5038103, at *6. What went on in those three days, however, was not "jury selection" in the sense of *voir dire* questioning or the exercise of challenges, whether peremptory or for-cause. Rather, during those three days the trial judge accommodated trial counsel's absence by confining the proceedings to the distribution and collection of questionnaires, and the grant or denial of hardship excuses. The record reveals the following:

On January 24, 2000, the trial judge instructed a group of potential jurors on the jury selection process and gave a brief overview of the case. In explaining Mr. Feinberg's absence, the judge told the jury panel:

> We have had a minor illness of one of our attorneys, and so I am working around that. I am attempting to use the time that we have to get your questionnaires filled out, which is time consuming, [and to] give the attorneys an opportunity to review them so we are prepared to question you without wasting a lot of your time unnecessarily.

(DE 12-4 at 11.) The next day, Wednesday, January 26, 2000, the judge similarly instructed another group of potential jurors and distributed questionnaires. *See Rodriguez*, 2015 WL

5038103, at *6. The judge again told the potential jurors about Mr. Feinberg's illness:

> We experienced a minor illness of one of the attorneys. Fortunately, we were able to work around that due to the professionalism of the attorneys. It was agreed I would work with you by myself, and for the purpose of getting these questionnaires filled out, which helps us a lot if the attorneys have access to them to be able to review them, as well as myself, so we will not be off schedule by more than a couple of days by virtue of the attorney's illness.
>
> I was able to find out this morning it was not serious, so that person will be able to be back with us on Monday [*i.e.*, January 31, 2000].

*Id.*

On Thursday, January 27, 2000, the judge distributed to counsel the questionnaires that had already been filled out, and assured everyone that Mr. Feinberg would be given ample opportunity to review the questionnaires before proceedings resumed on the afternoon of Monday, January 31, 2000. (DE 12-5 at 5–6.) The judge also instructed and distributed blank questionnaires to a fresh batch of potential jurors. The judge again explained that she had begun the process of orienting potential jurors and distributing questionnaires to accommodate Mr. Feinberg's absence. The judge added, "We now know when the attorney will be returning, and with the agreement of counsel, I am doing the orientation and filling out the questionnaires without them so as to keep on schedule." (*Id.* at 19.)

The trial proceedings resumed the following week, at 1 p.m. on Monday, January 31, 2000. The record reflects that Mr. Feinberg was present for the remainder of the jury selection process. (DE 12-6 at 2, 4 (January 31, 2000); DE 12-7 at 2, 3 (February 1, 2000); DE 12-8 at 2, 3 (February 2, 2000); DE 13-1 at 2, 3 (February 3, 2000); DE 13-2 at 2, 3 (February 4, 2000); DE 13-3 at 2, 3 (February 7, 2000); DE 13-4 at 2, 3 (February 8, 2000).)

The PCR court convened an evidentiary hearing on Mr. Rodriguez's claim based on the

three-day absence of counsel. Mr. Rodriguez was represented by separate counsel in connection

with that hearing. Mr. Feinberg testified. He confirmed that he suffered a heart attack and missed

three days as a result of his hospitalization. He agreed that the events he missed were the

completion of written questionnaires and the trial judge's grant of hardship excuses (the

"Hardship/Questionnaire" proceedings). (DE 17-1 at 92-93.) Public defender Andrew Rojas,

Esq., who represented co-defendant Perez, testified at the hearing that while Mr. Feinberg was

absent, the potential juror questionnaires were collected and reviewed only for the purpose of

screening for hardship excuses. Mr. Rojas testified that the interests of his client, Perez, and

those of Mr. Rodriguez were entirely parallel with respect to those narrow Hardship/

Questionnaire proceedings. (*Id.* at 26-28.) Mr. Rodriguez did not testify.

Based on that evidentiary record, the PCR judge rejected Mr. Rodriguez's IAC-Jury

Selection Claim:

> Here, unlike *State v. McCombs,* [81 N.J. 373,] 374 [(1979)]. [Mr.]
> Rodriguez was not "left adrift during so crucial a phase of the trial
> as the jury selection process." The selection, or more precisely, the
> rejection ritual was barren of the challenges inherent in jury
> selection. There was no weighing of the worthiness of any
> perspective juror. What transpired was a pre-jury selection session
> that was solely designed to eliminate "hardship cases" through the
> inspection of the submitted questionnaires. The testimony of Mr.
> Feinberg and Mr. Rojas and the trial transcript plainly convey what
> unfolded and the purpose of the protocol utilized. This preliminary
> review as described was not a "critical stage" and as a consequence
> there was no transgression of the defendant's "right to counsel."

(DE 10-6 at 86.)

The Appellate Division affirmed, explaining as follows:

> The PCR judge's factual findings with respect to what occurred
> during the limited portion of jury selection missed by Feinberg is
> fully supported by the record. During those three days, the trial
> judge held orientation sessions for prospective jurors and
> instructed them to complete questionnaires to determine whether

> their jury service would "impose a severe hardship due to circumstances which are not likely to change within the following year." N.J.S.A. 2B:20–10(c). When Feinberg returned, he was afforded the opportunity to review the questionnaires and participated in the remainder of jury selection.
>
> At no time during Feinberg's absence were potential jurors questioned on other issues or removed peremptorily or for cause. The facts in this case are significantly different from those in *McCombs*, 81 N.J. at 374-79, in which the Supreme Court held that a defense attorney who did not participate in the entire jury selection process was deficient.

*Rodriguez*, 2015 WL 5038103, at \*7. In short, said the Appellate Division, this was not a critical stage, but a this "pre-jury selection session that was solely designed to eliminate 'hardship cases' through the inspection of the submitted questionnaires." *Id.* at \*7. For these reasons, the Appellate Division found "no merit" to Mr. Rodriguez's IAC-Jury Selection Claim. *Id.*

To be sure, "[t]he Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Missouri v. Frye*, 566 U.S. 134, 140, 132 S. Ct. 1399, 1405 (2012) (quoting *Montejo v. Louisiana*, 556 U.S. 778, 786, 129 S. Ct. 2079 (2009) (quoting *United States v. Wade*, 388 U.S. 218, 227–28, 87 S. Ct. 1926 (1967)). Expressed that way, however, the principle is general. To warrant habeas relief, U.S. Supreme court precedent must more pointedly address "the specific question presented by this case." *Woods v. Donald*, 135 S. Ct. 1372, 1377 (2015) (quoting *Lopez v. Smith*, 574 U.S. \_\_, 135 S. Ct. 1, 4 (2014)).

When the Supreme Court said "specific," it meant it. In *Woods, supra,* the Supreme Court overturned the affirmance of federal habeas relief based on counsel's absence during trial testimony concerning the petitioner's codefendants.[6] Supreme Court case law established that the

---

[6]    The Petitioner's argument was that, although he claimed not to have been directly involved in the shooting, the charges against him included felony murder and aiding and abetting. Thus, he argued, the

testimony of a government witness was a "critical stage," but the Supreme Court had not

specifically addressed the issue of testimony "*about other defendants*." 135 S. Ct. at 1377.

(emphasis in original). Under AEDPA, 28 U.S.C. § 2254(d), cited *supra,* a state court decision is

not "contrary to" Supreme Court precedent because it reached the opposite result in

circumstances that were merely "similar." *Id.* To put it another way, *Woods* found that the Court

of Appeals had framed the "critical stage" issue at "too high a level of generality." *Id. Woods*

thus held that the state court's application of Sixth Amendment precedents was neither contrary

to, nor an unreasonable application of, U.S. Supreme Court precedent.

I have found no U.S. Supreme Court case addressing the "specific question" presented by

this case: whether distribution of questionnaires and granting hardship excuses is a "critical

stage" requiring the presence of counsel.[7] That in itself is sufficient to doom the claim under

---

testimony of this government witness was a critical phase of the trial, as to which prejudice from his
counsel's absence would be presumed.

[7]     Pretrial proceedings identified as "critical" for Sixth Amendment purposes include "arraignments,
postindictment interrogations, postindictment lineups, and the entry of a guilty plea." *Frye,* 566 U.S. at
140 (citing Supreme Court precedents). Trial-related proceedings identified as critical, because
"substantial rights" of the accused are affected, include arraignment, competency hearings, a post0-
indictment lineup, a preliminary hearing, a plea hearing, closing arguments, and sentencing. *Mempa v.
Rhay,* 389 U.S. 128, 134, 88 S. Ct. 254, 257 (1967). *See also Gardner v. Florida,* 430 U.S. 349, 358
(1977) (sentencing); *United States v. Roy,* 855 F.3d 1133, 1147 (11th Cir. 2017) (summarizing existing
law).

The absence of positive Supreme Court authority is sufficient for present purposes under
AEDPA. I note in addition, however, that analogous Supreme Court authority tends to suggest that the
Court would answer the question posed by this case in the negative. In *Rushen v. Spain,* 464 U.S. 114,
121, 1004 S. Ct. 453, 457 (1983), a juror answered during *voir dire* that she had no prior knowledge of
facts relevant to the case. The evidence, however, jogged her memory; when an uncharged murder was
introduced in evidence, she realized that the victim had been a childhood friend. During trial, the juror
went to the judge's chambers and, *ex parte,* informed him that her *voir dire* answers had been inaccurate.
She stated to the judge that her deliberations would not be biased by that knowledge. The encounter was
revealed only later. On a petition for a writ of habeas corpus, the defendant argued that his Sixth
Amendment right to have counsel present (as well as his right to be present personally) had been violated
by the *ex parte* conversation, requiring reversal of his conviction *per se,* without further inquiry into
prejudice. The U.S. Supreme Court disagreed, and subjected this claim to the usual § 2254(d) deference
and a harmless-error analysis. It upheld the conviction based on post-trial factual findings, after a hearing,
that the juror's *ex parte* exchange with the judge did not prejudice the defendant.

AEDPA. I note in addition, however, that the U.S. Court of Appeals for the Second Circuit has dealt with this issue; it has held explicitly "that hardship questioning is not a part of voir dire— and thus not a critical stage of the trial during which the parties and counsel must be present." *United States v. Greer*, 285 F.3d 158, 168 (2d Cir. 2002) (citing Second Circuit case law).

The state court, considering the "critical stage" (or "crucial stage") issue, cited *State v. McCombs*, 81 N.J. 373, 408 A.2d 425 (1979), which cited federal as well as state constitutional precedents. In distinguishing *McCombs,* the state court did not unreasonably apply U.S. Supreme Court precedent. In *McCombs*, defense counsel had been excused before trial and was absent for the entire *voir dire* process of jury selection. The New Jersey Supreme Court emphasized that what is "critical" about the critical stage is the selection of an *impartial* jury, through the process of *voir dire* questioning (even if done by the judge). In distinguishing *McCombs* and finding that counsel's absence did not impair the selection of an impartial jury, the state court here did not run afoul of Sixth Amendment standards or Supreme Court case law. And "[w]here the ' "precise contours" ' of [a] right remain ' "unclear," ' state courts enjoy 'broad discretion' in their adjudication of a prisoner's claims." *Woods,* 135 S. Ct. at 1377.[8]

The state court here permissibly found that there was no impairment of the right to have counsel participate in the selection of an impartial jury. The Hardship / Questionnaire process -- the only time during which Mr. Feinberg was absent -- was not a critical stage of the proceedings. It did not weed out jurors based on partiality. It did not require counsel's exercise of strategy or advocacy on Mr. Rodriguez's behalf. In short, this process did not implicate the

---

[8] Quoting *White v. Woodall*, 572 U.S. __, 134 S.Ct. 1697, 1705 (2014) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76, 123 S. Ct. 1166 (2003), in turn quoting *Harmelin v. Michigan*, 501 U.S. 957, 998, 111 S. Ct. 2680 (1991) (KENNEDY, J., concurring in part and in judgment)).

selection of an impartial jury. A juror who had a sufficient hardship was simply *unavailable* to participate for the duration of the trial. Such a juror could not feasibly serve and was excused, for reasons having nothing to do with the merits of the case or the juror's attitudes towards it. And of course the questionnaires themselves, to the extent they bore on the exercise of peremptory challenges, were made available for counsel's inspection before any peremptory challenges were exercised.[9]

The state court's application of federal law was reasonable. Moreover, the state court reasonably found as a matter of fact that nothing critical requiring the input of counsel occurred in those preliminary sessions, and nothing before me is sufficient to overcome the deference that I am required to give such a finding.

Federal habeas relief on Ground Two of the Petition (the IAC-Jury Selection Claim) is therefore denied.

## C. Ground Four: Discriminatory Exclusion of Hispanic Jurors

Mr. Rodriguez claims that Hispanics were unconstitutionally excluded from the venire pool (referred to as "Array Composition Claim") and that the State "us[ed] peremptory challenges in a discriminatory manner" during jury selection (referred to, for simplicity, as the "*Batson* Claim"). (DE 1 at 27.) Although the two aspects of the claim are sometimes conflated in the papers, they are distinct, and I discuss them separately. Both aspects of this claim will be denied.

---

[9]    I add that there are no facts in this record to support Mr. Rodriguez's claim that something about the hardship excuse process bore upon, or impaired him from raising, a claim that Hispanics were systematically excluded from service. Such a claim was in fact raised and rejected. The hardship excuse process preceded the exercise of peremptory challenges, for which Mr. Feinberg was present. The claims relating to the ethnic composition of the venire and the allegedly discriminatory exercise of peremptory challenges are discussed substantively in Section IV.C, *infra*.

### 1. Ground Four's Array Composition Claim

#### a. State court rulings

During trial, Mr. Rodriguez and Mr. Romero joined in several arguments pertinent to the issues now raised in Ground Four, including a challenge to the ethnic composition of the jury array. The trial judge acknowledged the prosecutor's argument that the challenge came too late, in that selection was underway. But the judge discussed and rejected the challenge on the merits, explaining that the Essex County's array selection process had previously withstood constitutional scrutiny. The court stated that "[t]he fact that a particular pool of jurors might or might not meet with the defendant's requirements or expectations as to the ethnic makeup is not relevant as long as the system is as fair as it can be humanly made." (DE 10-2 at 45.)

On direct appeal, Mr. Rodriguez asserted the jury-array component of his claim, but the Appellate Division rejected it. (DE 10-3 at 26-27.) In doing so, the court incorporated by reference its discussion of co-defendant Romero's similar claim in a prior written decision. (*Id.* at 27; DE 10-2 at 43-49.) Romero had asserted that counsel rendered IAC by "fail[ing] to effectively challenge the [county's] jury selection process on the ground that it unfairly excluded Hispanics." (DE 10-2 at 43.) The Appellate Division rejected Mr. Romero's claim, citing prior state Supreme Court case law finding that Essex County's jury-array selection process was constitutional. (*Id.* at 45 (citing *State v. Gilmore*, 103 N.J. 508, 511 A.2d 1150 (N.J. 1986).) *See also State v. McDougald*, 120 N.J. 523, 549-50 (1990); *State v. Ramseur*, 106 N.J. 123, 212-38, 524 A.2d 188 (1987).[10]

On appeal from the denial of PCR, the Appellate Division found no merit in Petitioner's

---

[10]     *Ramseur* was disapproved on other grounds in *Jones v. United States*, 527 U.S. 373, 383, 119 S. Ct. 2090, 2099 (1999). Lists for selection of petit and grand jurors are drawn in the same manner.

PCR Jury-IAC challenge to the jury array. The issue had already been rejected on direct appeal.

Mr. Rodriguez argues that he was raising a distinct issue, based on his counsel's three-day

absence.[11] The Appellate Division rejected the notion that Mr. Feinberg's absence had prejudiced

the jury-array challenge in any way. This claim, the Appellate Division held, did not satisfy

either *Strickland* prong:

> As previously noted, Feinberg did object to the ethnic composition
> of the jury array, and the trial judge rejected the argument on the
> merits. Rodriguez has not demonstrated that Feinberg's objection
> would have been successful had it been raised earlier in jury
> selection process, during the brief period of time he was absent. As
> a consequence, he cannot satisfy the second *Strickland* prong, even
> if he could have satisfied the first.

*Rodriguez*, 2015 WL 5038103, at \*8. The Appellate Division determined that Mr. Rodriguez's

PCR Jury-IAC Claim was without merit as a matter of fact and law. *Id.*

### b. Discussion

The Sixth Amendment requires that no distinctive group be systematically excluded from

the pool or array from which juries are selected. *See Taylor v. Louisiana*, 419 U.S. 522, 530

(2009). The state court (and the *Romero* opinion it cited, DE 10-2 at 45) noted that Essex

County's method of compiling the venire, or juror source list, was upheld against constitutional

challenge in *Gilmore, McDougald,* and *State v. Ramseur, supra.[12]* Ramseur himself revived that

---

[11]     Mr. Rodriguez argued that his jury-related PCR claim was "fundamentally different from the
claim raised in the direct appeal" because it was based on counsel's three-day absence, "based on trial
counsel's ineffectiveness in failing to procure [counsel] coverage for the [juror] questionnaire proceeding
during [Mr. Feinberg's] hospitalization; due to counsel's failure, defendant had no opportunity to raise a
timely objection to the racial makeup of the panel." *Rodriguez*, 2015 WL 5038103, at \*8 (emphasis added
in original). These grounds appear to relate to the challenge to the jury array. Mr. Feinberg was not absent
for the exercise of peremptory challenges.

[12]     Indeed, these state decisions are *a fortiori* cases. *Gilmore*, relied on by the state court, emphasized
that in this area, federal constitutional standards established only the "floor of minimum constitutional
protection"; the State Constitutional right to a jury drawn from a representative cross-section of the
community affords "greater protection to our citizens' individual rights than accorded them under the
federal constitution." 130 N.J. at 523–24.

challenge in a federal habeas petition, the denial of which was upheld, after substantial factual and statistical analysis, by the U.S. Court of Appeals for the Third Circuit. *Ramseur v. Beyer*, 983 F.2d 1215, 1229–35 (3d Cir. 1992).

Viewed substantively, the state court rulings are well supported by case law. They are not contrary to Supreme Court case law.

Viewing the claim as one of IAC, I cannot find deficient performance or prejudice. Counsel did raise this challenge to the array. The challenge was rejected by the trial court, but if the trial court's ruling was wrong, the claim would not be one of IAC, but rather of ordinary error, correctable on appeal. As it happens, on direct appeal the Appellate Division rejected that very claim of error, *i.e.*, that Hispanics had been systematically or unfairly excluded from the jury pool. Particularly given the strong prior case law upholding the county's system for summoning jurors, I cannot find that counsel's representation fell short of acceptable professional standards. I can find no error, moreover, in the Appellate Division's finding that Mr. Feinberg's initial absence had no effect on the jury-array challenge.

There is nothing here sufficient to rebut the presumption of correctness of the Appellate Division's decision upholding the trial judge's rejection of the challenge to the ethnic composition of the jury array. *Rodriguez*, 2015 WL 5038103, at *8. Mr. Rodriguez has not rebutted the presumption by clear and convincing evidence, and he has not shown that this determination was unreasonable in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(2) & (e)(1).

Ground Four's Array Composition Claim is therefore denied.

**2. Ground Four *Batson* Claim:**

The State is constitutionally prohibited from using its peremptory challenges to exclude jurors on the basis of race or ethnicity. The three-part test to determine whether a peremptory challenge is unconstitutionally based on race was set forth by the Supreme Court in *Batson v. Kentucky,* 476 U.S. 79 (1986). First, a defendant must show that a peremptory challenge has been exercised on the basis of race. Second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question. Third, the trial court must determine whether the defendant has shown purposeful discrimination. *See id.* at 96–98; *accord United States v. Milan,* 304 F.3d 273, 281 (3d Cir. 2002), *cert. denied,* 538 U.S. 1024 (2003). State constitutional law is parallel. *See State v. Gilmore,* 103 N.J. 508, 522, 511 A.2d 1150, 1157 (1986) ("We observe that under *Batson*'s interpretation of the Equal Protection Clause of the Fourteenth Amendment . . . the United States Constitution would compel the result that we reach on independent state grounds").

### a. State court rulings

At trial, the judge rejected the challenge of Mr. Rodriguez and Mr. Romero (DE 12-2 at 45-49) to the State's allegedly discriminatory exercise of peremptory challenges to exclude Hispanics and African-Americans. The defense, the judge ruled, had not shown a substantial likelihood that the State had exercised peremptory challenges based on assumptions about group bias (illegitimate) rather than situation-specific bias evinced by a particular juror (legitimate). In particular, the judge found no indicia of discrimination. As the court found, the prosecution had not struck all, or most, African Americans and persons with Hispanic surnames. In the judge's estimation, there was no indication of racial or ethnic exclusion, because *all* of the jurors seated at that point were either African American or Hispanic, with one probable exception.[13] The judge

---

[13]    One juror by the name of Teixera, counsel seemed to agree, was likely of Portuguese extraction.

further observed that while the prosecution had excluded two Hispanic jurors, the defense had done the same. (DE 10-2 at 48; DE 12-2 at 46.) The challenge failed, then, for failure to make the *prima facie* showing required by state case law (which, for present purposes, is identical to *Batson*).

On direct appeal, Mr. Rodriguez argued that his trial counsel's "acceptance of the jury panel as satisfactory and [counsel's] failure to exhaust defendant's peremptory challenges deprived him of his constitutional right to effective assistance of counsel, because the issue was not preserved for direct appeal." (DE 10-3 at 27.) The Appellate Division disagreed (*id.* at 27). citing its written opinion disposing of co-defendant Mr. Romero's similar claim ("Romero Jury-IAC Claim"). (*Id.*; DE 10-2 at 45-49.)

Mr. Romero had asserted that counsel rendered IAC because the State used its peremptory challenges to exclude only African-Americans and Hispanics, in violation of his constitutional right to an impartial jury. He also claimed that his own counsel was ineffective for failing to pursue a challenge. (*Id.* at 45-46.) The Appellate Division rejected his claim, first correctly summarizing the governing law under *Batson, supra*:

> An impartial jury does not require the systematic inclusion of cognizable groups, but does preclude the State's use of peremptory challenges to unreasonably restrict the possibility that a petit [jury] will comprise a representative cross-section of the community ...
>
> The Sixth Amendment['s] guarantee[] [of] ... trial by an impartial jury ... prohibits selective removal of jurors who are members of a cognizable group on the basis of their presumed group bias ...
>
> There is a rebuttable presumption that the prosecution has exercised its peremptory challenges on permissible grounds. Once defendant has made a timely challenge to the prosecution's use of peremptory challenges, the defendant must make a prima facie showing that those challenges were exercised on grounds that were constitutionally impermissible. This requires a showing that the potential jurors wholly or disproportionately excluded were

> members of a cognizable group within the meaning of the
> representative cross-section rule.
>
> The defendant then must show that there is a substantial likelihood
> that the peremptory challenges resulting in the exclusion were
> based on assumptions about group bias rather than any indication
> of situation-specific bias.
>
> Once the defendant establishes a prima facie case, the burden shifts
> to the prosecutor to show evidence that the peremptory challenges
> were justified based on concern for bias specific to the situation.

(DE 10-2 at 46 (internal quotations and citations omitted).) The Appellate Division held that the

Romero Jury-IAC Claim had "no basis." (*Id.* at 48-49.)

In so ruling, the Appellate Division referred favorably to the trial judge's finding that the

defense had not met the second prong of a prima facie claim of constitutionally impermissible

peremptory challenges -- *i.e.*, a substantial likelihood that the peremptory challenges were based

on assumptions of group bias rather than bias specific to that juror. (*Id.* at 48.) This suggests that

counsel's failure to prevail on the *Batson* claim did not result from deficient performance, and in

any event was not prejudicial, because the claim had no reasonable probability of success. The

Appellate Division reasonably decided that the trial court was correct in finding that the

peremptory challenges displayed no pattern or indicia of discrimination.

In PCR proceedings, Mr. Rodriguez contended that trial counsel "was constitutionally

ineffective for failing to object to the State's systematic elimination of Hispanics from the jury

panel during jury selection." (DE 10-6 at 77 ("PCR Jury-IAC Claim").) Given that the Appellate

Division on direct appeal had disposed of Mr. Romero's challenge to the same jury selection

process, the PCR judge found that New Jersey Rule of Court 3:22-5[14] barred Mr. Rodriguez's

---

[14]     That Rule provides that "[a] prior adjudication upon the merits of any ground for relief is
conclusive whether made in the proceedings resulting in the conviction or in any post-conviction
proceeding brought pursuant to this rule or prior to the adoption thereof, or in any appeal taken from such
proceedings."

PCR Jury-IAC Claim. (*Id.* at 78)

The Appellate Division upheld this portion of the PCR rulings on the PCR appeal. It held that the trial judge's account of the limited scope of proceedings during Feinberg's absence was fully supported by the record. No peremptory challenges were implicated in this "pre-jury selection session that was solely designed to eliminate 'hardship cases' through the inspection of the submitted questionnaires." *Rodriguez*, 2015 WL 5038103 at *7. The conclusion that this was not a "critical stage," it held, was legally sound. *Id.*

### b. Discussion

Ground Four's *Batson* Claim invokes the Sixth and Fourteenth Amendments. Mr. Rodriguez argues that his counsel rendered IAC by failing to contest the State's use of peremptory challenges to exclude Hispanics or African-Americans from the jury. (DE 1 at 27.) That claim fails on the merits. The state courts' application of *Strickland* and *Batson* standards to the pertinent facts was objectively reasonable.

*Strickland*'s deficient-performance prong is not met, for several reasons. First, Mr. Feinberg *did* make a *Batson*-style objection at trial. *See supra.* Second, this claim was fully litigated at trial and on direct appeal. (DE 12-2 at 44-49; DE 10-2 at 43-49.) Thus, I see no basis to find that counsel failed to act in this regard. Third, the state courts' rulings were neither an unreasonable application of clearly established federal law nor an unreasonable determination of the facts. The trial court, faced by a challenge, followed *Batson* standards (citing *Gilmore*), and made reasonable findings that no pattern of discrimination was established. *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (applying presumption of correctness under § 2254(e)(1) to state court's factual findings regarding *Batson* claim).

Mr. Rodriguez suggests that he suffered prejudice or a denial of due process because his counsel's failure to exhaust all peremptories impaired his assertion of the *Batson* issue on appeal. No such impairment appears in the record. What doomed the *Batson* claim was the trial court's finding that the pattern of prosecution challenges did not establish discrimination.

On direct appeal, the Appellate Division correctly applied *Gilmore*, the state-law equivalent of *Batson*. (DE 10-2 at 46-47.) The state appellate court agreed with the trial court's ruling on the *Gilmore* issue and noted that Mr. Rodriguez seemingly conceded that the trial judge decided it correctly. (DE 10-2 at 48.)

Consistent with the state court findings, and my review of the record, I likewise conclude that Mr. Rodriguez's *Batson*-related challenge, whether viewed substantively or as an IAC claim, is meritless. The state courts applied the proper analyses. Mr. Rodriguez failed to demonstrate that the peremptory challenges were exercised to exclude minority representation from the jury. Nor has he now demonstrated, as required by § 2254(d), that the actions of the state courts "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

"Because a convicted defendant must satisfy both prongs of the *Strickland* test [*i.e.*, deficient performance and prejudice], failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong." *United States v. Manamela*, 612 F. App'x 151, 154 (3d Cir. 2015) (citing *Strickland*, 466 U.S. at 699). Here, Petitioner established neither, as the state courts reasonably found under a correct application of the governing *Strickland* precedent and the underlying *Batson* standards.

Habeas relief on the *Batson* component of Ground Four is therefore denied.

### D. Ground Three: Failure To Excuse Juror Thirteen During Trial

Ground Three, while it discusses a few jurors, centers on juror number thirteen. Mr. Rodriguez claims that "[j]uror number thirteen was followed and intimidated by four people from the audience, while alone." He also claims that "jurors fourteen and eleven were approached by a stranger who attempted to speak with them about the case. This incident exacerbated juror thirteen's safety concerns." (DE 1 at 26-27.) He continues that the State "used juror thirteen's fear to [its] advantage during summation and made unfair comments inferring that the defense may be responsible for what occurred." (*Id.* ("Impartial Jury Claim").) The result, he says, was denial of his right to an impartial jury.

#### 1. State court rulings

During trial, on February 18, 2000, the judge announced that three jurors had told a sheriff's officer that someone from the audience had attempted to speak to them. The judge prudently determined that she should question the jurors, and did so. Juror fourteen reported that when she and juror eleven were leaving the courthouse the day before, someone from the courtroom audience walked up behind them and asked: "What do you think?" Juror fourteen did not respond, and no more was said. Juror fourteen believed that this brief incident would not affect her ability to be fair and impartial. (DE 10-2 at 22-23.) Juror eleven's account was parallel, except that she recalled juror fourteen responding "I don't know nothing." Juror eleven, too, believed this brief encounter would not prevent her from being a fair juror. (*Id.* at 23.)

The judge also questioned juror thirteen. Juror thirteen explained that he had been "followed by four people" who crossed the street each time he did. Those people "kind of laughed and joked as [if] to intimidate me. That's what the intention was." (*Id.*) Juror thirteen

31

recognized the individuals following him as people who had been in the courtroom audience that morning. (*Id.* at 24.) He said he thought it was a scare tactic, to let him know he was in danger. He stated that perhaps more juror security would be desirable, "only because I know that there was a tactic that was executed upon me when I was alone." (*Id.*) He added: "Let's put it this way. I don't like being out in that hall when we're waiting." (*Id.*) However, he vehemently denied that he experienced a level of discomfort or fear that would prevent him being a fair and impartial juror. (*Id.* ("What's going on with the trial and what people are sitting here are two different things, and the people that are sitting here. I don't know who they are, what their allegiance is. I know nothing at all").) The judge asked again: "Do you feel you can be a fair and impartial juror?" Juror thirteen answered: "Absolutely." (*Id.*) The judge instructed all three jurors she questioned that they were not to discuss the matter with the other jurors. (*Id.*)

Defense counsel raised no issue with continuing to seat jurors eleven and fourteen, since being approached did not seem to bother them at all. Counsel for Mr. Rodriguez and Mr. Romero asked the trial judge to excuse juror thirteen, however, saying he was "paranoid." (*Id.*) The trial judge denied the defendants' request to dismiss juror thirteen; instructed the entire jury as to how to treat approaches from outsiders; and instituted additional measures to keep the jurors separated from the spectators. (*Id.*; DE 14-5 at 105-06.)

Mr. Rodriguez and his co-defendant Mr. Romero raised the Impartial Jury Claim on direct appeal. (DE 10-2 at 22-25.) The Appellate Division rejected the claim, correctly citing the governing Sixth Amendment federal law that "the accused has a constitutional right to a trial by an impartial jury," which "means that a defendant is entitled to a jury free of outside influences." (DE 10-2 at 25 (internal citations omitted).) Citing state case law (which is consistent with federal standards), the Appellate Division noted that "[t]he test for determining whether irregular

influences on jurors merit a new trial is whether it 'could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge.'" (*Id.* (internal citations omitted).) Applying those legal principles, the Appellate Division decided that the trial judge had "acted within her discretion" in denying the request to excuse juror thirteen. The Appellate Division explained that the record did not support the claim that juror thirteen was placed in such fear that he would or had been influenced:

> [The defendant] speculates that the juror was influenced by fear to find him guilty on all counts. However, influence cannot be inferred merely because that was the verdict. As juror thirteen made clear, he did not get any message which way the outsiders might have wanted to influence him, if at all, or, as he said, what their "allegiance was." The incident was without content, and was related to the trial only because he recognized the people as spectators. He was prompted to bring it to the attention of the judge only to support additional protective measures for the jury. [I]n this regard[,] no error "clearly capable of producing an unjust result" occurred in this context. *R.* 2:10-2.

(DE 10-2 at 27.) The Appellate Division determined that the Impartial Jury Claim was meritless as a matter of fact and law. On September 23, 2004, the New Jersey Supreme Court denied certification. *State v. Rodriguez*, 859 A.2d 692 (N.J. 2004).

### 2. Discussion

The Sixth Amendment guarantees every criminal defendant "the right to a ... trial[ ] by an impartial jury." U.S. Const. amend. VI. Complementing that right are the protections afforded by the Fourteenth Amendment's Due Process Clause, which have "long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois,* 504 U.S. 719, 727 (1992); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) (the Fourteenth Amendment guarantees each criminal defendant the right to a trial by an

impartial jury free of outside influences). *See also State v. Williams*, 459 A.2d 641 (N.J. 1983) ("it has long been recognized under the federal Constitution that a defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself").

The applicable U.S. Supreme Court precedents governing third party contact with a jury are *Remmer v. United States*, 347 U.S. 227 (1954) ("*Remmer I*"), *Remmer v. United States*, 350 U.S. 377 (1956) ("*Remmer II*"), and *Smith v. Phillips*, 455 U.S. 209 (1982).

If allegations of jury bias involve a third party's contact with a juror during a trial about the matter pending before the jury, the contact is deemed presumptively prejudicial to the defendant. *Remmer I*, 347 U.S. at 229; *see also United States v. Vega*, 285 F.3d 256, 266 (3d Cir. 2002).[15] However, this presumption of prejudice is not conclusive. *Vega*, 285 F.3d at 266 (citing *Remmer I*, 347 U.S. at 229). The trial court must conduct a hearing to "determine the circumstances, the impact thereof upon the juror, and whether or not [the contact] was prejudicial, in a hearing with all interested parties permitted to participate." *Remmer I*, 347 U.S. at 230. The government has the burden of rebutting the presumption by showing that the "contact with the juror was harmless to the defendant." *Id*. at 229-30; *see also Vega*, 285 F.3d at 266 (government must prove that the improper communication did not and will not prejudice the defendant). "If after [the] hearing [the incident] is found to be harmful," the trial court should grant a new trial. *Remmer I*, 347 U.S. at 229–30.

---

[15]     "In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is ... deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties." *Vega*, 285 F.3d at 266 (quoting *Remmer I*, 347 U.S. at 229).

*Remmer I*'s rebuttable presumption applies only to a "direct communication [about the matter pending before the jury] between a juror and a third party during deliberations." *United States v. Console*, 13 F.3d 641, 666 (3d Cir. 1993) (distinguishing between the circumstances warranting *Remmer I*'s presumption of prejudice and those warranting *Smith*'s actual prejudice analysis). *Accord Vega*, 285 F.3d at 266 (citing *Waldorf v. Shuta*, 3 F.3d 705, 710 (3d Cir. 1993) and *Console*, 13 F.3d at 667). A new trial will be required if the defendant proves that he or she was actually prejudiced by the improper contact. *Smith*, 455 U.S. at 215, 217–18.

In short, once credible jury-partiality allegations are made, a hearing is required in order to determine the effect any improper jury contact had on the defendant's trial. The government must prove that the contact was harmless in order to avoid a retrial, or, when *Smith* applies, the defendant must prove that he was actually prejudiced by the contact in order to get a retrial.

Here, the Appellate Division ruled that Mr. Rodriguez failed to establish any unconstitutional influence on juror thirteen. That ruling was not contrary to or an unreasonable application of U.S. Supreme Court precedent, for two reasons:

First, nothing was communicated to juror thirteen about Mr. Rodriguez's case—or so the trial and appellate courts were entitled to find from the evidence. As the Appellate Division correctly noted, the culprits, whoever they were, made no express statement or threat. As for any implied message, juror thirteen testified to the contrary: he "did not get *any* message," he said, from the individuals who followed him on the street. (DE 10-2 at 27; emphasis added.) Those individuals only "kind of laughed and joked as [if] to intimidate" him. (DE 10-2 at 23.) Juror thirteen "made clear [that] he did not get any message which way the outsiders might have wanted to influence him, if at all." (*Id.*) The motivation, then, could have been purely mischievous or malicious. (*Id.* at 24.) About the *content* of any intended or implied message, the

35

juror expressly said he knew "nothing at all." (*id.* at 24) Nor could he say who the individuals were in relation to the trial, other than perhaps spectators.[16]

So, as the Appellate Division succinctly concluded, "[t]he incident was without content." (*Id.*) Mr. Rodriguez has not shown there was contact with juror thirteen about a matter pending before the jury. It follows that federal precedent does not mandate a presumption of prejudice with respect to the Impartial Jury Claim. The state courts' rulings were not contrary to and did not unreasonably apply United States Supreme Court precedent. At any rate, their fact finding was reasonable in light of the record before them, consisting of the statements of the jurors themselves.

Second, even if there had been an error, my analysis would not be done. As the Supreme Court has observed, "most" errors, even constitutional ones, "can be harmless." *Arizona v. Fulminante*, 499 U.S. 279, 306 (1991). Federal courts may not grant habeas relief unless a petitioner demonstrates that the alleged error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). In the context of this case, that means that Mr. Rodriguez would have to demonstrate that the allegedly erroneous retention of juror thirteen "actually prejudiced" him. (*Id.* (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986).) Based on the record before me, there is no basis for such a finding.

The trial court questioned juror thirteen individually. The juror stated that the Incident would not prevent him from being fair and impartial, or affect his vote in this case. (*See* DE 10-2

---

16     Under 28 U.S.C. § 2254(d), the state court findings of fact are presumed to be correct; and Mr. Rodriguez has failed to rebut that presumption. Further, under 28 U.S.C. § 2254(d) state court conclusions of law are binding on a federal court in habeas corpus unless they resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

at 23-24.) None of the surrounding circumstances compel a contrary conclusion or cast doubt on the trial court's fact finding. The individuals who followed juror thirteen made no physical contact or statement, regarding the trial or anything else. Juror thirteen did not even find the Incident significant enough to report until another juror said she had been approached. (DE 10-2 at 23.) Juror thirteen's conduct thus conveys that his level of fear was mild, corroborating his statement that he could remain impartial. The trial judge acted within his discretion in concluding that juror thirteen had not been influenced and that any remaining concerns could be addressed by some simple additional security measures. Mr. Rodriguez cites nothing beyond "speculat[ion] that the juror was influenced by fear to find him guilty on all counts." (DE 10-2 at 27.) The state courts reasonably found otherwise. Neither untoward influence nor actual prejudice can be inferred.

Mr. Rodriguez's § 2254 Petition expressly concedes that juror thirteen "said he could be fair." (DE 1 at 26.) Petitioner does not demonstrate with any evidence that the trial court was not entitled to credit that statement, or that the juror in fact deliberated and voted in an unfair or biased manner. Petitioner thus fails to demonstrate: (1) that the state courts' decisions were contrary to, or an unreasonable application of, federal precedent; or (2) actual prejudice.

Ground Three (Impartial Jury Claim) is therefore denied.

### E.    Renewed Motion for Evidentiary Hearing

On October 16, 2017, Mr. Rodriguez submitted a renewed motion for an evidentiary hearing "to be simultaneously reconsidered with his habeas petition ... on his claim that trial counsel's failure to advise him of his right to testify deprived him of effective assistance of counsel." (DE 32 at 2.) I will deny that motion. As noted above, the state court held an evidentiary hearing on that claim and entered factual findings to which I am bound to defer. The

Petition being without merit, Mr. Rodriguez's hearing request does not merit further written discussion and his motion is denied. *See generally Zettlemoyer v. Fulcomer*, 923 F.2d 284, 298 n.2 (3d Cir. 1991).

## V.    CERTIFICATE OF APPEABILITY

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). Applying this standard, the Court rules that a certificate of appealability shall not issue in this case.

## VI.    CONCLUSION

For the foregoing reasons, Petitioner's § 2254 petition will be denied on the merits. His renewed motion for an evidentiary hearing is denied. The Court declines to grant a certificate of appealability. An appropriate order will be entered.

DATED: March 21, 2019

KEVIN MCNULTY
United States District Judge